**UNITED STATES of America**

v.

**Paschal McGUINNESS, Defendant.**

**No. 90 Cr. 813 (RLC).**

United States District Court,
S.D. New York.

May 21, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for the U.S.; Elizabeth Glazer, Asst. U.S. Atty., of counsel.

Dominic F. Amorosa, Stephen E. Kaufman, New York City, for defendant.

## OPINION

ROBERT L. CARTER, District Judge.

The indictment in this case charges Paschal McGuinness, president of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "Carpenters' Union") and of its Local 608, with one count of conspiracy and four counts of substantive offenses. Count One of the indictment charges the defendant with conspiracy to violate Section 302 of the Taft–Hartley Act, 29 U.S.C. § 186 (the "Act"). The Act

makes it unlawful, among other things, for an employer to give money or other thing of value "to any representative of any of his employees who are employed in an industry affecting commerce," 29 U.S.C. § 186(a)(1), or "to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization." 29 U.S.C. § 186(a)(4). The Act also makes it a crime for any person to request, demand, receive, or accept, or agree to request, demand, receive or accept, any such prohibited payment from an employer. 29 U.S.C. § 186(b)(1).

Counts Two and Three of the indictment charge McGuinness with accepting, agreeing to accept and aiding and abetting the acceptance of payments from two particular employers, Cord Contracting and Elgem Sales and Service, in violation of 29 U.S.C. § 186(a)(1), (b)(1) and 18 U.S.C. § 2. Counts Four and Five charge him with accepting and agreeing to accept the same payments as those alleged in Counts Two and Three, but as violative of 29 U.S.C. § 186(a)(4), (b)(1) and 18 U.S.C. § 2. *See United States v. Ricciardi*, 357 F.2d 91 (2d Cir.) (indictment charging defendant with receiving payment both as representative of employees and as officer of labor union is proper, as these are separate offenses under the statute), *cert. denied*, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 840 (1966).

By pretrial motion, McGuinness seeks an order dismissing Counts Two through Five; striking certain of the overt acts in Count One; and directing the government to file a bill of particulars, to obtain all state law enforcement files relating to the New York State investigation of him, to furnish state court orders permitting the release of state grand jury proceedings, and to provide material pursuant to Rule 16, F.R.Cr.P., and pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). By separate motion, McGuinness seeks to suppress the fruits of certain electronic eavesdropping evidence.

## I. PRETRIAL MOTION

### A. *Counts Two through Five*

McGuinness asserts that Counts Two through Five should all be dismissed on the grounds that (1) they are time-barred under the applicable five-year statute of limitations, 18 U.S.C. § 3282, (2) they allege multiple crimes within each count, in violation of Rule 8(a), F.R.Cr.P., and (3) they fail to give him fair notice of the charges against him, in violation of Rule 7(c)(1), F.R.Cr.P. Underlying all three arguments for dismissal is McGuinness's characterization of each of Counts Two through Five as involving multiple offenses, since multiple payments are alleged in each of these counts. Citing *United States v. Cohen*, 384 F.2d 699 (2d Cir.1967), McGuinness asserts that each payment alleged to have been made in violation of the Act must be charged as a separate offense.

Counts Two and Four, alleging payments from Cord Contracting, identify the payments as having been made from the "[l]ate 1970's up to and including December 1985," and amounting altogether to $6,000. Counts Three and Five, alleging payments from Elgem Sales and Service, identify the payments as having been made from "in and about 1980 up to and including 1986," and amounting altogether to $16,000. All of these counts also allege, in incorporating by reference a paragraph from the conspiracy count, that McGuinness accepted payments from employers "to maintain the goodwill of the [union] officials who controlled which carpenters would be supplied to a particular employer and to discourage those officials from sending incompetent or unskilled workers." Indictment ¶ 9.

#### 1. Statute of Limitations

The indictment was filed on November 29, 1990. McGuinness contends that counts Two through Five are barred by the applicable five-year statute of limitations because they incorporate payments made before November 29, 1985.

From a plain reading of the indictment, it is evident that each of Counts Two through Five charges McGuinness with a continuing

offense, although the indictment could have been drafted more explicitly. "A continuing offense is one which by its nature or by its terms is a single, ongoing crime." *United States v. Castellano*, 610 F.Supp. 1359, 1408 (S.D.N.Y.1985) (Sofaer, J.). The various payments aggregated in each of Counts Two through Five point to a continuous course of conduct, involving the same employer and the same underlying agreement to accept payments in exchange for favorable treatment in the assignment of workers. *See, e.g., United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir.1989) ("acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme"), *cert. denied*, — U.S. —, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

 The holding in *Cohen, supra*, 384 F.2d at 700, does not bar the government from proceeding against McGuinness on such aggregated charges. In that case, the Second Circuit held that the government is not limited to one count against the defendant when several payments in violation of the Act have been made pursuant to a single agreement. Nothing in *Cohen* dictates that a defendant *must* be charged with a separate offense for each particular alleged payment simply because he *may* be so charged. In fact, aggregation of separate payments otherwise prohibited by the Act has been held to be proper, where, as here, there was an alleged scheme or mechanism under which recurring bribes were made. *United States v. Papia*, 910 F.2d 1357, 1364–65 (7th Cir.1990).

While each of Counts Two through Five encompasses payments that were allegedly made outside the statute of limitations period, each charges McGuinness with having continued to commit a substantive offense into the limitations period. Each of Counts Two through Five is therefore timely charged under 18 U.S.C. § 3282. *See, e.g., United States v. Rastelli*, 870 F.2d 822, 839 (2d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989).

### 2. Duplicity

Rule 8(a), F.R.Cr.P., provides for the joinder of offenses in the same indictment, "in a separate count for each offense." As the Court of Appeals has explained:

> Important policy considerations underlie the rule that two or more distinct crimes should not be alleged in a single count of an indictment. If an indictment is duplicitous, a general verdict of guilty will not reveal whether the jury found defendant guilty of only one crime and not the other, or guilty of both. Moreover, a guilty verdict on a duplicitous indictment does not indicate whether the jury found defendant guilty without having reached an unanimous verdict on the commission of a particular offense. Thus, the prohibition of duplicity is said to implicate a defendant's rights to notice of the charge against him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in subsequent prosecution.

*United States v. Murray*, 618 F.2d 892, 896 (2d Cir.1980) (citations omitted).

 However, a single count of an indictment is not necessarily duplicitous in violation of Rule 8(a) whenever it contains several allegations that could have been charged as separate offenses. *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir.1981). The doctrine of duplicity should be invoked only when an indictment implicates the underlying policy considerations of Rule 8(a). *Id.* at 732–33; *Murray, supra*, 618 F.2d at 896.

Counts Two through Five, assessed in view of these policy considerations, present some danger of infringement on McGuinness's rights. Dismissal of the counts is unwarranted, however, because this possibility can be avoided. First, instructions to the jury can be tailored and the jury can be provided with a special verdict form in order to meet McGuinness's concerns about a unanimous jury verdict. Second, with respect to McGuinness's rights to adequate notice of the charges against him and to protection against double jeopardy, the government shall be required to furnish a bill of particulars listing the approximate

date and amount of each alleged payment encompassed within Counts Two through Five. *See, e.g., United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987) (function of bill of particulars is to provide defendant with information necessary for him to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense); *see also Castellano, supra,* 610 F.Supp. at 1381. The bill of particulars should also disclose for each such payment the name of the person making the payment, if known to the government. The government shall file this bill of particulars within a reasonable time, not to exceed one week after receipt of this opinion.

Since this bill of particulars will provide McGuinness with the requisite notice of the charges against him, the court need not discuss McGuinness's argument for dismissal of Counts Two through Five on Rule 7(c) grounds.

### B. *Overt Acts*

McGuinness next argues that the court should strike certain of the overt acts included in the conspiracy count, for essentially the same reasons as those in support of dismissing Counts Two through Five. Specifically, he contends that an overt act is by definition a singular act, transaction or event, and that overt acts (f), (g), (n), (y) and (z) must therefore be stricken because they all allege multiple payments, not single payments.

As overt act (f), the indictment charges that "[f]rom December 1980 up to and including December 1982, in New York, New York, a representative of Pomar Construction made payments each Christmas of approximately $500 to $1000 in cash to John O'Connor for distribution to the officers and employees of Local 608, including the defendant, Paschal McGuinness." The indictment charges similar sets of payments, made by different contractors, as overt acts (g), (n), (y) and (z).

First, it is clear from the indictment that each of these overt acts refers to a continuing offense and is therefore proper-

ly pleaded for the same reasons that the multiple payments referred to in Counts Two through Five were properly aggregated. Second, there is no case law to support McGuinness's bold assertion that multiple payments cannot be alleged in a single overt act. Third, McGuinness's concerns about a unanimous jury verdict may be addressed by explicit instructions to the jury and by a special verdict form. Finally, to the extent that McGuinness objects to these overt acts on grounds of inadequacy of notice and lack of protection against double jeopardy, the government shall be required to disclose in its bill of particulars the approximate date and amount of each alleged payment encompassed within each of overt acts (f), (g), (n), (y) and (z), as well as the identity of the person making the payment, if known to the government. *See Bortnovsky, supra,* 820 F.2d at 574.

### C. *Bill of Particulars*

On January 22, 1991, McGuinness requested the government to furnish him with particulars as to: (1) the names of all co-conspirators; (2) the approximate time at which he allegedly entered the conspiracy; (3) the number of different acts alleged in overt acts (b), (d), (e), (n), (y) and (z), and brief descriptions of each; (4) the names of the Local 608 officials referred to in overt act (m); (5) in which overt acts he allegedly received cash personally; (6) the names of persons who allegedly gave him money other than John O'Connor, a former business representative of Local 608; and (7) whether he is charged in Counts Two through Five as a principal or as an aider and abettor. The government has agreed to provide McGuinness with a list of co-conspirators two weeks prior to trial and has informed him that it intends to proceed against him both as a principal and as an aider and abettor on Counts Two through Five. *See* Letter of Elizabeth Glazer to Stephen E. Kaufman and Dominic Amorosa, dated February 8, 1991, at 1. The government has taken the view that all of the remaining requested information is not within the proper scope of a bill of particulars. *See id.*

█ The approximate amount and date of each payment referred to in overt acts (b), (d) and (e), as well as the name of the person making the payment (if known to the government), should be provided in the government's bill of particulars, for the same reasons that it must provide such information for payments encompassed within Counts Two through Five and overt acts (f), (g), (n), (y) and (z). *See supra* I(A)(2).

McGuinness requests that the government be ordered to furnish the list of co-conspirators "now," rather than two weeks prior to trial. He cites to no legal authority to support his contention that he is "entitled" to the list before that time. He merely offers conclusory statements that he may have insufficient time to pursue any investigative leads and that he may prepare to call a witness whom the government has identified as a co-conspirator "on the eve of trial."

█ As a general matter, a defendant is not entitled to a preview of the government's evidence. *See, e.g., United States v. Torres,* 901 F.2d 205, 232 (2d Cir.1990); *United States v. Wilson,* 565 F.Supp. 1416, 1438–39 (S.D.N.Y.1983) (Weinfeld, J.); *United States v. Boneparth,* 52 F.R.D. 544, 545 (S.D.N.Y.1971) (MacMahon, J.); *United States v. Cimino,* 31 F.R.D. 277, 279–81 (S.D.N.Y.1962) (Edelstein, J.). However, the government has offered no good reason for withholding the list of co-conspirators until two weeks before trial. Moreover, earlier disclosure of these names would better ensure that the trial will proceed smoothly and efficiently. Since the government has not shown that revealing the names of the co-conspirators prior to two weeks before trial will undermine its trial strategy or endanger its witnesses, it should disclose the names of the co-conspirators to the defendant at the time it files its bill of particulars.

The remaining information sought by McGuinness is clearly beyond the proper scope of a bill of particulars. *See, e.g., Torres, supra,* 901 F.2d at 233–34. McGuinness's motion with respect to these particulars is therefore summarily denied.

D. *State Law Enforcement Files and Court Order Authorizing Release of Grand Jury Proceedings*

This case stems from an investigation initiated by New York State prosecutors and draws, at least in part, on a state grand jury investigation of McGuinness. McGuinness moves for an order directing the government to obtain documents from state prosecutors so that the government will be in a position to furnish him with material required by *Brady, supra,* and 18 U.S.C. § 3500, and to produce a copy of the court order authorizing disclosure of the state grand jury materials. The government has represented to the court that it has already obtained all relevant documents from state prosecutors and that it is willing to produce a copy of the court order. A court order concerning these two matters is therefore unnecessary at this time.

E. *Rule 16 Material*

1. Financial Records

McGuinness contends that the government must provide him with "defendant's financial records, the financial records of John O'Connor and the financial records of Government witnesses," on the grounds that they are "necessarily material to the defense within the meaning of Rule 16." Memorandum of Law in Support of Pretrial Motion of Paschal McGuinness ("Def. Pretrial Mem.") 11. Rule 16(a)(1)(C), F.R. Cr.P., with certain exceptions, requires the government to permit a defendant to inspect and copy documents "which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant."

█ Before the government can be required to produce evidence under Rule 16(a)(1)(C) on the grounds that it is material to the defense, "it is incumbent upon a defendant to make a *prima facie* showing of 'materiality.'" *United States v. Buckley,* 586 F.2d 498, 506 (5th Cir.1978), *cert.*

*denied,* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979); *see United States v. Jordan,* 399 F.2d 610 (2d Cir.), *cert. denied,* 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968); *United States v. Shoher,* 555 F.Supp. 346, 353 (S.D.N.Y.1983) (Haight, J.) (quoting *Buckley* ); *United States v. Cafaro,* 480 F.Supp. 511, 519 (S.D.N.Y.1979) (Sweet, J.). Evidence is "material" for purposes of Rule 16(a)(1)(C) if pretrial disclosure will enable the defendant "significantly to alter the quantum of proof in his favor." *United States v. Whiteside,* 810 F.2d 1306, 1308 (5th Cir.1987), *quoted with approval in United States v. Agajanian,* 852 F.2d 56, 58 (2d Cir.1988). McGuinness has made only a conclusory allegation that these documents are "material" for the purposes of Rule 16(a)(1)(C). *See* Def. Pretrial Mem. 11 & exh. 3. This is plainly insufficient. *See United States v. Cadet,* 727 F.2d 1453, 1466 (9th Cir.1984); *United States v. Conder,* 423 F.2d 904, 910 (6th Cir.), *cert. denied,* 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 267 (1970); *Shoher, supra,* 555 F.Supp. at 353.

 Regarding McGuinness's own financial records, the court notes that the government is required to produce them, regardless of materiality, if they "were obtained from or belong to the defendant." Rule 16(a)(1)(C), F.R.Cr.P. McGuinness's motion papers, however, do not allege that the requested records in fact were obtained from or belong to him. Accordingly, the court has no basis to order their production on these grounds.

### 2. Grand Jury Transcript

Under Rule 16(a)(1)(A), F.R.Cr.P., the government must furnish a defendant with "recorded testimony of the defendant before a grand jury which relates to the offense charged." The requirements of Rule 16(a)(1)(C) that the document must be in the possession of the government and must be material to the defense do not apply.

McGuinness has requested a transcript of his grand jury testimony in the Eastern District of New York in 1979 or thereabouts. The government does not seriously contest that the material relates to the offenses charged, but attests to the difficulty in finding the transcript. According to the uncontradicted affirmation of Elizabeth Glazer submitted by the government, the grand jury clerk for the Eastern District manually records the names of each day's witnesses in a ledger. Because the government does not know the date, month or exact year of the testimony, the only way to locate the transcript is a manual, day-by-day search of the ledgers.

McGuinness's right to the transcript does not depend on the government's view that "the relevance of this material [is] marginal ... to the charges in the indictment." Government's Memorandum of Law in Opposition to Defendant's Pretrial Motion ("Govt. Pretrial Mem.") 16. At the same time, the government should not be compelled to expend an unreasonable amount of effort to find a transcript whose usefulness to the defense has not been established. If McGuinness knows or can ascertain the approximate or exact date of the testimony, or has any clues that would help the government ascertain that date, he should provide that information to the government. The government must exercise reasonable diligence to try to find the transcript; and if the transcript is found, McGuinness must be allowed to inspect and copy it.

McGuinness also seeks, without stating the basis for the request, any promises or grants of immunity to McGuinness in connection with his grand jury testimony. There is no basis for disclosure of this information under Rule 16(a)(1)(A), and McGuinness has not offered any reason to believe that this information is in the control of the government and material to the defense within the meaning of Rule 16(a)(1)(C).

### F. *Brady and Giglio Material*

McGuinness has also moved for an order compelling the government to produce the following information, which he alleges he is entitled to under the rule of *Brady v.*

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963):[1]

1. All information, including documentary, of things of value provided to or promised to any Government witnesses.

2. All information, including documentary, of all crimes and offenses committed by any Government witness.

3. All information relating to promises made by any law enforcement officer to any Government witness.

4. Whether any Government witness has been or is the subject of any civil or criminal tax investigation.

5. All information relating to defendant's refusal to accept money or things of value from any employer.

Def. Pretrial Mem. 16 (herein "Requests 1–5").

### 1. Impeachment Material

■ Requests 1–4 are obviously not *Brady* material in the sense of evidence that tends directly to exculpate the defendant, but are useful to the defense for impeachment purposes only. *But see United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (government must disclose impeachment material); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (same). It is well settled that the government is not required to disclose impeachment material before the relevant witness has testified. *See United States v. Biaggi,* 675 F.Supp. 790, 812 (S.D.N.Y. 1987) (Motley, J.); *United States v. Massino,* 605 F.Supp. 1565, 1581 (S.D.N.Y.1985) (Sweet, J.), *rev'd on other grounds,* 784 F.2d 153 (2d Cir.1986); *United States v. Abrams,* 539 F.Supp. 378, 390 (S.D.N.Y. 1982) (Stewart, J.); *United States v. Mitchell,* 372 F.Supp. 1239, 1257 (S.D.N.Y.) (Gagliardi, J.), *appeal dismissed and mandamus denied sub nom. Stans v. Gagliardi,* 485 F.2d 1290 (2d Cir.1973); *see also United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974).

Accordingly, with respect to Requests 1–4, the government is not obligated to turn over the material until after the respective witnesses have testified. The government, however, should not withhold the material for purposes of delay or without good reason. In the interest of efficiency of the trial, therefore, the government should turn over the material two weeks prior to trial unless providing the material at that time would adversely affect its trial strategy or endanger its witnesses. The parties should request a conference with the court to be held on or about June 15, 1991, to discuss what materials will or will not be supplied before trial.

### 2. Other Material

Request 5, however, which seeks information regarding whether McGuinness refused any bribes, appears to seek disclosure of evidence for purposes other than impeachment.

■ The refusal of bribes on specific occasions is not admissible in evidence to prove the character of the accused. Under Rule 405, F.R.Evid., character may not be proved by specific instances of a person's conduct unless that character "is an essential element of a charge, claim, or defense," Rule 405(b), F.R.Evid., although inquiry into specific instances is permitted on cross-examination. Rule 405(a), F.R.Evid. Thus, the material sought in Request 5 cannot be exculpatory, *see United States v. Scarpa,* 897 F.2d 63, 70 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990), but is at best impeachment material.

Moreover, *Brady* applies only to facts that are not already known to the defendant. *United States v. Diaz,* 922 F.2d 998, 1007 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2035, 114 L.Ed.2d 119 (1991). The government need not "facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshall on their own." *Shoher, supra,* 555 F.Supp. at 352. McGuinness should know, better than anyone, if he refused any bribes from employers, as well

---

**1.** Under *Brady,* the government is constitutionally required to provide the defendant, on request, with exculpatory or mitigating evidence in the government's possession.

as the circumstances under which any such refusals occurred. The government has represented that it has no evidence pertaining to any such refusals. *See* Govt. Pretrial Mem. 17. It is difficult to imagine what evidence, not already in McGuinness's possession, regarding any such refusals could come into the government's possession in the future. Thus, the material sought in Request 5 is not *Brady* material.

## II. MOTION TO SUPPRESS WIRE EVIDENCE

### A. *Factual Background*

On August 12, 1985, Justice Steven Crane, of the Supreme Court of New York for the County of New York, issued a warrant permitting law enforcement officials to intercept oral communications at the offices of Local 257 of the Carpenters' Union, located at 157 East 25th Street in Manhattan. On November 25, 1985, Justice Crane amended the warrant to include authorization to wiretap three phone lines to the Local 257 offices. Thirty-day extensions of the warrant were granted on September 12, October 12, November 9, and December 11, 1985, and on January 10, 1986. McGuinness does not challenge the validity of these orders.

On February 9, 1986, Justice Crane issued a Sixth Extended Eavesdropping Warrant (the "sixth extension") that, among other things, authorized a wiretap of four telephone lines at the offices of Local 608 of the Carpenters' Union, located at 1650 Broadway, 7th floor, in Manhattan. The sixth extension also added John F. O'Connor, an officer of Local 608, as a target of the investigation.

Justice Crane issued a Seventh Extended Eavesdropping Warrant (the "seventh extension") on March 11, 1986, an Eighth Extended Eavesdropping Warrant (the "eighth extension") on April 9, 1986, and a Ninth Extended Eavesdropping Warrant (the "ninth extension") on May 10, 1986. The seventh extension continued the authority to tap the Local 608 telephones and added McGuinness as a target of the investigation. The eighth extension continued the Local 608 wiretapping authority and added authority to intercept oral communications at the Local 608 office. The ninth extension continued the Local 608 wiretaps only.

According to the government, all electronic surveillance of the Local 257 offices had ended on March 11, 1986, the "bug" to intercept oral communications in the Local 608 office had been removed on May 7, 1986, and the wiretaps on the Local 608 telephones were ended on May 27, 1986.

### B. *Probable Cause*

The extensions were based on the affidavits of Joseph J. Coffey, a Principal Investigator with the New York State Organized Crime Task Force. McGuinness challenges the sixth, seventh and eighth extensions as having been issued without probable cause on the grounds that Coffey's affidavits were facially insufficient. Although he does not mention it in his memorandum of law, he apparently also challenges the ninth extension.[2]

■ The interception of wire and oral communications is regulated by 18 U.S.C. §§ 2510 *et seq.*, as added by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and subsequently amended. In

---

**2.** The government argues that this court should apply the rule of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which held that the Fourth Amendment exclusionary rule does not apply to searches conducted in objectively reasonable good-faith reliance on a defective warrant. It is doubtful, however, whether the *Leon* exception applies to wiretaps, since the exclusionary rule for wiretaps is explicitly commanded by statute, 18 U.S.C. § 2518(10)(a), while the exclusionary rule for ordinary searches is a judicial gloss on the Fourth Amendment's general prohibition of un-

reasonable searches. *Compare United States v. Spadaccino,* 800 F.2d 292, 296 (2d Cir.1986) (holding that *Leon* does not apply to Connecticut state wiretap statute, on grounds suggesting that it does not apply to federal statute either), *with United States v. Gambino,* 741 F.Supp. 412, 415 (S.D.N.Y.1990) (Leisure, J.) (deciding, without discussion, that *Leon* applies to electronic surveillance). The court does not need to decide this issue, however, since the wiretap order in this case was supported by probable cause, as discussed *infra.*

order to issue a wiretap order, a judge must find that

 (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in [18 U.S.C. § 2516 [3]];

 (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

 (c) normal investigative procedures ... reasonably appear to be unlikely to succeed ...; [and]

 (d) there is probable cause for belief that the facilities from which ... communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). "Probable cause" to issue a wiretap order exists when, under the totality of the circumstances, the facts contained in the supporting affidavits are sufficient to lead a reasonably prudent person to believe that these requisite circumstances exist. *See United States v. Rowell*, 903 F.2d 899, 901–03 (2d Cir.1990); *cf. Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964) (probable cause for arrest). Probable cause requires "only a probability, and not a *prima facie* showing of criminal activity." *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983); *see also Rowell, supra*, 903 F.2d at 902 (probable cause standard for wiretap order same as for search warrant).

 The court's review of the sufficiency of the affidavits is not *de novo*. *See Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *United States v. Gallo*, 863 F.2d 185, 191 (2d Cir.1988), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989). The issuing court's determination of probable cause is entitled to "great deference" by the reviewing court. *Id.* Justice Crane's successive determinations that

there was probable cause must therefore be upheld as long as he had a "substantial basis" for concluding that a wiretap would uncover evidence of wrongdoing. *Id.*

 Coffey's Affidavit in support of the application for the sixth extension ("Coffey Aff. 6th"), attached as exhibit 1 to McGuinness's Memorandum of Law in Support of Motion to Suppress Wire Evidence ("Def. Suppression Mem."), affords a substantial basis for concluding that there was probable cause for the sixth extension. It relates that, in 1982 and 1983, O'Connor had accepted bribes from undercover officers, and that the Local 608 telephones had been used for communications in connection with the bribes. Coffey Aff. 6th ¶¶ 51–54. During the negotiations between O'Connor and one of the undercover agents, O'Connor stated several times that he needed to get approval from his "boss." *Id.* ¶ 63. On one occasion O'Connor brought the agent to speak to his "boss," whom the agent photographically identified as McGuinness. *Id.*

 The affidavit also presented evidence that the corrupt activity was continuing in 1985. Specifically, it sets out a conversation intercepted on the Local 257 wire in September of 1985, involving a contractor named Mario Marsillo and two officials of Local 257, Attilio Bitondo and Gene Hanley, suggesting that Marsillo had bribed O'Connor. Coffey Aff. 6th ¶ 55. Bitondo was angry with Marsillo because Marsillo was using non-union workers on a construction job on the East Side, within Local 257's jurisdiction. Marsillo asked to "have a cup of coffee"—apparently a euphemism for a bribe—with Bitondo, but Bitondo refused, saying "This here we shoulda done two months ago had a cup of coffee." *Id.* ¶ 55 at 43. After Bitondo and Hanley discussed with Marsillo the picketing at his site because of his failure to sign the union agreement, Marsillo said "I tried to reach, reach out * * *." *Id.* at 45. Hanley replied "You reached out to the wrong people Mario." *Id.* Marsillo answered, " * * * I

---

**3.** Illegal payments to union officials are among the enumerated offenses. *See* 18 U.S.C. § 2516(1)(b).

did reach out to the wrong people the only thing I went to John, John O'Connor * * *. But how do you do through [*sic*, 'who do you go through'?] when you don't know nobody? * * * I thought that ya know that a one delegate a knows the other knows that. And I'll send you Mario here ya know whatever." *Id.* at 45–46.

The affidavit also details a conversation of November 7, 1985, between Bitondo and a certain Mike Sega, in which Sega tells Bitondo that a contractor named Joe Gorrall had been able to work without "any trouble" in Local 608's territory without a union contract. Coffey Aff. 6th ¶¶ 64–65.[4] Coffey also mentions that in a conversation of January 29, 1986, Bitondo said that McGuinness was worried that Arthur Giangrande would cooperate with the government against him if he was convicted at trial. *Id.* ¶ 63.

To be sure, this evidence would not be sufficient to support a conviction of the Local 608 officials for any activities in 1985 or 1986. Taken together with the evidence of corruption in 1982 and 1983,[5] however, and judged in the light of common sense and experience, the 1985 and 1986 conversations could lead a reasonable person to infer that a wiretap of the Local 608 telephones would probably disclose some evidence of bribery involving O'Connor, if not McGuinness. Accordingly, the court finds that Justice Crane had a substantial basis for finding probable cause for the sixth extension.

The court also upholds Justice Crane's determination that probable cause existed for adding McGuinness as a target and extending the electronic surveillance of Local 608 in the seventh extension. Coffey's

affidavit in support of that extension, Def. Suppression Mem. exh. 2 ("Coffey Aff. 7th"), sets out a number of conversations intercepted by the Local 680 wiretap strongly indicating that Local 680 officials were taking bribes.

In reference to McGuinness, in particular, a certain Pat Tierney told Patrick Harvey, a Local 608 business agent, "I was with Paschal [McGuinness] on Friday * * *. We had our ... [interrupted by Harvey] ... have breakfast together." Coffey Aff. 7th ¶ 17 at 14. Harvey responded: "Listen (stutters) you don't say that to anybody. You just uh ya know what I mean. You know (stutters) meet somebody you don't pass ... you know what I mean. You can tell me...." *Id.* Tierney responds, "Oh I know that." *Id.* On the basis of Harvey's reaction, and in view of the use of expressions like "have breakfast" and "have a cup of coffee" elsewhere in the intercepted conversations, it appears that the conversation was in reference to bribery.[6] The affidavit also indicates that McGuinness had regular meetings with Jim Gavin, Secretary–Treasurer of Local 608, outside the office. *Id.* ¶ 20.

This evidence, together with the other evidence of bribery at the Local 608 office uncovered in the wiretaps as presented in the affidavit, *e.g.*, Coffey Aff. 7th ¶¶ 7–16, 19, 21–30, and considered against the background of the affidavit in support of the sixth extension, afforded Justice Crane an adequate basis to issue the seventh extension.

██ McGuinness contends that Coffey's affidavit in support of the eighth extension does not sufficiently implicate him in any

---

**4.** The affidavit also discusses a conversation in which Hanley referred a contractor named Dino Tomasetti to John Keane, a business agent at Local 608. Coffey Aff. 6th ¶ 61. The court does not rely on this conversation in determining that the warrant was issued with probable cause.

**5.** When otherwise stale information is corroborated by recent evidence of continuing criminal conduct, probable cause may be found. *United States v. Macklin,* 902 F.2d 1320, 1326 (8th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991); *Emery v. Holmes,* 824

F.2d 143, 149 (1st Cir.1987); *see Rowell, supra,* 903 F.2d at 903; *United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982).

**6.** The affidavit also discusses a conversation between McGuinness and Harvey in which Harvey tells McGuinness "I got some stuff," to which McGuinness responds "Alright, well ah I'll meet you after noon." Coffey Aff. 7th ¶ 18. The court does not rely on this conversation in making its determination of probable cause.

wrongdoing. However, the statute does not require the issuing judge to find probable cause that every person whose conversations will be overheard has committed a crime. The relevant question is not whether any particular individual is culpable, but whether the conversations sought to be monitored are likely to contain evidence of a crime. *See* 18 U.S.C. § 2518(3); *United States v. Shipp,* 578 F.Supp. 980, 986–87 (S.D.N.Y.1984) (Weinfeld, J.), *aff'd sub nom. United States v. Wilkinson,* 754 F.2d 1427 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *see also United States v. Kahn,* 415 U.S. 143, 152–54, 94 S.Ct. 977, 982–84, 39 L.Ed.2d 225 (1974).[7] On the basis of the affidavit, read in the context of the earlier affidavits, it is clear that there was probable cause to monitor McGuinness's telephone conversations.

McGuinness also opposes the seventh and eighth extensions, and apparently also the ninth, on the grounds that each was tainted by the preceding warrants. Because the preceding warrants were issued with probable cause, the court rejects this contention.[8]

### C. *Minimization*

 Under the terms of Justice Crane's orders, as mandated by 18 U.S.C. § 2518(5), the surveillance was to be conducted "in a manner designed to minimize the interception of non-relevant and privileged conversations." "Minimization" in the context of a wiretap only requires a reasonable effort to minimize the interception of irrelevant calls. *United States v. Manfredi,* 488 F.2d 588 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). Minimization generally involves turning off the wiretap as soon as it is determined that a conversation is irrelevant. It is generally inapplicable to calls of less than two minutes, "too brief a period for an eavesdrop-

per even with experience to identify the caller and characterize the conversation." *United States v. Capra,* 501 F.2d 267, 275–76 (2d Cir.1974) (citation omitted), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); *see Scott v. United States,* 436 U.S. 128, 140–42, 98 S.Ct. 1717, 1724–26, 56 L.Ed.2d 168 (1978).

The affirmation of Dominic Amorosa ("Am.Aff."), McGuinness's attorney, in support of McGuinness's motion for a hearing regarding improper minimization, consists largely of conclusory statements of the following form: "[T]he line sheets of April 4, 1986, from line 541–4380, from 6:22 to 10:04 * * * indicate that investigator Mullen fielded [a] total of 74 calls during this period of time. Out of 74 calls 42 evidently involved conversations. Of the number of calls involving conversations, the line sheets indicate that Mullen properly minimized a total of 4 calls." Am.Aff. ¶ 9; *see also id.* ¶¶ 8, 10–20.

If McGuinness could establish that the wiretap was not turned off when it should have been for certain specific calls, the court would exclude evidence derived from those particular calls. McGuinness does not, however, indicate which of the calls he contends were "properly minimized" and which were not. The vast majority of the non-minimized calls are less than two minutes in length. *See* Government's Memorandum of Law in Opposition to Defendant's Motion to Suppress Wire Evidence, exh. B (Elizabeth Glazer Affirmation), ¶ 6; Am.Aff. exhs. A–M. McGuinness does not state any reason why the court should believe that the other non-minimized calls were irrelevant to the investigation.

 Thus, the motion is essentially directed not at any particular calls but at the wiretap as a whole. The court will not exclude all evidence gathered by the wire-

---

7. Failure to name a target of monitoring in the affidavit or order, even if he is a suspect, does not require suppression. *United States v. Donovan,* 429 U.S. 413, 432–37, 97 S.Ct. 658, 670–73, 50 L.Ed.2d 652 (1977).

8. The court notes that in a case involving McGuinness's alleged co-conspirators, Justice

Dorothy A. Cropper of the New York Supreme Court for New York County also concluded that the sixth, seventh, eighth and ninth extensions were supported by probable cause. *People v. O'Connor,* No. 7953/87, slip op. at 20–22 (N.Y. Sup.Ct. Sept. 6, 1989).

tap on the basis of a few "fribbling excesses." *United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir.1987). Even if some irrelevant conversations were listened to in their entirety, the statute is not violated if the eavesdropping officers made a good-faith effort to achieve minimization. *United States v. Cirillo*, 499 F.2d 872, 881 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974). Minimization efforts are to be judged by a standard of "reasonableness in the context of the entire wiretap, as opposed to a chat-by-chat analysis." *Hoffman, supra*, 832 F.2d at 1308; *see Scott, supra*, 436 U.S. at 140, 98 S.Ct. at 1724–25. Suppression of the entire wiretap is warranted only when, at a minimum, "a substantial number of nonpertinent conversations ha[ve] been intercepted unreasonably," *Cirillo, supra*, 499 F.2d at 880, and possibly only in cases of pervasive disregard of the minimization requirement. *See Hoffman, supra*, 832 F.2d at 1309.

The government has made a *prima facie* showing that it complied with the minimization requirements. *See Cirillo, supra*, 499 F.2d at 880. McGuinness has presented no evidence that the officers unreasonably intercepted a substantial number of nonpertinent conversations, or that they improperly failed to minimize the monitoring of any particular nonpertinent call. Accordingly, there is no need for a hearing on the motion to suppress wiretap evidence on grounds of improper minimization. *See Cirillo, supra*, at 880.

### D. *Privileged Communications*

McGuinness also alleges that the government intercepted certain calls that were protected by attorney-client privilege. Am.Aff. ¶ 22 & exh. N. From Amorosa's affirmation, together with the line sheets, it appears that the enumerated calls were in fact privileged attorney-client communications. The government does not dispute this contention anywhere in its memorandum of law. The court is not convinced, however, that the monitoring of the privileged conversations was unlawful, inasmuch as the officers may not have been immediately aware that they were listening to privileged communications. Nonetheless, the privileged communications are

excludable at trial. *See* Rule 501, F.R. Evid. Accordingly, the government will not be permitted to introduce in evidence any of the conversations listed on the first page of exhibit N of the Amorosa Affirmation.

### III. CONCLUSION

In sum, (1) the government shall file a bill of particulars within a reasonable time, not to exceed one calendar week after receipt of this opinion, listing the approximate date and amount of each alleged payment encompassed within Counts Two through Five and within overt acts (b), (d), (e), (f), (g), (n), (y) and (z) of Count One of the indictment, and the name of the person making each such payment, if known to the government; (2) at the same time, the government shall provide the defendant with a list of his alleged co-conspirators; (3) the government shall exercise reasonable diligence to try to find the transcript of McGuinness's grand jury testimony, and McGuinness should help in the task by giving the date of the testimony or any clues that may help determine it; and if the transcript is found, the government shall allow McGuinness to inspect and copy it; and (4) the government shall not introduce in evidence any of the conversations listed on the first page of exhibit N of the Amorosa Affirmation.

The government shall provide impeachment material, if it does not adversely affect the government's trial strategy or endanger its witnesses, at least two weeks before trial. However, if producing the material at that time would have such adverse effect, the government may stand on its right to produce the material only after each witness testifies. The parties are to confer with the court circa June 15, 1991, to discuss what materials will or will not be supplied before trial.

In all other respects, McGuinness's pretrial motion and motion to suppress wire evidence are summarily denied.

IT IS SO ORDERED.